851 P.2d 985

**LATHAM MOTORS, INC., an Idaho corporation, Plaintiff–Counter-defendant–Respondent,**

v.

**Gaylord PHILLIPS and Sherry Delgado aka Sherry Phillips, Defendants–Counterclaimants–Appellants.**

No. 18882.

Court of Appeals of Idaho.

Oct. 23, 1992.

Rehearing Denied March 26, 1993.

Petition for Review Denied May 24, 1993.

Goodman & Duff, Rupert, for appellants. Alan C. Goodman, argued.

Benoit, Alexander, Sinclair, Doerr, Harwood & High, Twin Falls, for respondent. J. Walter Sinclair, argued.

SILAK, Judge.

This case involves a dispute over the title to a car. The car's certificate of title was issued in the name of "Phillips, Gaylord or Sherry." Latham Motors, an automobile dealer, claims it should receive title to the car on the grounds that it purchased and took possession of the car pursuant to a contract it entered into with Sherry Phillips. The defendant, Gaylord Phillips, claims title to the car by virtue of the fact that Sherry Phillips sold the car without his consent and Latham Motors never received the car's certificate of title, which remained at all times in Gaylord Phillips' possession. The district court entered judgment in favor of Latham Motors, concluding that: (1) because Sherry Phillips was listed as an alternate owner on the certificate of title she had actual and apparent authority to transfer ownership of the car to Latham Motors, and (2) Idaho's Motor Vehicle Code does not require actual physical delivery of the certificate of title at the time of the sale of a motor vehicle in order to transfer ownership of the vehicle. We reverse.

## I. FACTS AND PROCEDURAL HISTORY

The underlying facts are as follows. In January, 1988, Gaylord Phillips bought a 1985 Ford Tempo automobile for $4,995. Phillips' unrebutted testimony establishes that his daughter, Sherry Delgado aka Phillips, completed and submitted the application for the certificate of title with the Idaho Transportation Department, and that she had her own name put on the title as the second owner. Title to the Tempo was issued jointly to "Phillips, Gaylord or Sherry." The certificate of title was sent to Phillips who, after receiving it, took no action to alter the title's language designating both him and his daughter, Delgado, as owners of the vehicle. From the time the title was issued until the present, Phillips has kept the title in his exclusive possession in a safety box at his house.

Phillips' unrebutted testimony establishes that he paid for and insured the Tempo with his own money. His unrebutted testimony further establishes that after he pur-

chased the car, the car was given to Delgado, not as a gift, but for her use. Delgado used the car to commute from her home in Twin Falls to her place of employment in Jackpot, Nevada. On December 13, 1988, Delgado shopped for a car at Latham Motors, an automobile dealership in Twin Falls. While looking at an American sports car, Delgado was approached by a salesman. The salesman showed Delgado several cars and asked her if she would like to use the Tempo as a trade-in to purchase a newer vehicle.

The record contains conflicting evidence regarding the conversation between Delgado and the salesman. Delgado testified that she told the salesman that she could not "completely" trade the Tempo without her father's permission, because he owned the car. Delgado further testified that after continuing to look at automobiles, she decided she wanted to use the Tempo as a trade-in to purchase a 1989 Dodge Daytona. She also testified, however, that she repeatedly told the salesman that her father owned the Tempo and that she would have to get permission and the title from him before the deal could be finalized. She further testified that it was her understanding that if she could not persuade her father to go along with the deal and give her the title, she would be allowed to return the Daytona and get the Tempo back.

Latham Motors' salesman testified that, initially, Delgado said she needed to talk it over with her father before purchasing a car, but that she did not say her father owned the Tempo and would necessarily have to approve any deal involving the car. The salesman testified that later Delgado simply changed her mind and decided to purchase a new car without talking to her father first. He further testified that Delgado informed him that title to the Tempo was in both her and her father's names and that the certificate of title was in her father's possession, but that she would get the title from her father and deliver it to Latham Motors within a few days.

It is undisputed that Delgado decided to trade-in the Tempo and purchase the Daytona. While at Latham Motors, Delgado signed and submitted a credit application, a bill of sale for the Tempo, and a retail installment contract for the purchase of the Daytona. Delgado also signed a blank copy of an application for duplicate title. Delgado testified, however, that she did not really read the papers she signed, and that she was told the papers were mere formalities to facilitate the consummation of the transaction should her father later give his permission. After signing the papers, Delgado removed her things from the Tempo, delivered the Tempo's keys to Latham Motors, and then drove away in the new Daytona.

On December 15, 1988, without having discussed the transaction with her father, Delgado attempted to return the Daytona to Latham Motors, claiming that she could not afford the vehicle and that she knew her father would not give her the title to the car. Latham Motors refused to take the car back and told Delgado that the Tempo had already been sold to someone else. That same day, Latham Motors called the Idaho Transportation Department and, for the first time, verified the names and the wording on the Tempo's certificate of title. Latham Motors was informed by the Department that the title to the Tempo was issued to "Phillips, Gaylord or Sherry." Latham Motors subsequently filled out the application for duplicate title previously signed by Delgado, checking the box on the application which indicated that the original certificate of title had been lost, and submitted the application to the Transportation Department. Along with this application for duplicate title, Latham Motors filled out a transfer of title request, also previously signed by Delgado, requesting in Delgado's name that the Transportation Department issue title to the Tempo in the name of the person who had subsequently purchased the car from Latham Motors.

Phillips learned about the transaction between Delgado and Latham Motors when he was contacted by Chrysler Credit Corporation several days after the transaction occurred. Chrysler Credit Corporation called Phillips in an effort to verify the information on the credit application Delga-

do submitted for financing of the Daytona. Phillips informed Chrysler Credit Corporation that Delgado could not afford to make payments on the Daytona, after which he contacted Latham Motors and learned that Delgado had traded-in the Tempo toward the purchase of the Daytona. Phillips informed Latham Motors that he owned the Tempo and that he would not deliver the car's certificate of title to Latham Motors. When he learned that an application for duplicate title had been submitted to the Transportation Department, Phillips contacted the Department and informed them that the certificate of title was not lost, and that he had it in his possession. As a result, the Department refused to issue the requested duplicate title.

It is undisputed that: (1) before the bill of sale on the Tempo was signed and delivered by Delgado to Latham Motors, Delgado informed Latham Motors that title to the car was in both her and her father's names; (2) Delgado informed Latham Motors that the certificate of title was in her father's possession; (3) Latham Motors never attempted to contact Phillips about his interest in the Tempo; (4) Latham Motors relied solely on the word of Delgado regarding the ownership and title of the Tempo–Latham Motors never called the Transportation Department to verify the status of the title until after Delgado attempted to return the Tempo claiming that her father would not give her the car's certificate of title; and (5) Latham Motors knew that the Tempo's certificate of title was not lost, but in the possession of Phillips, when Latham Motors submitted the application for duplicate title to the Transportation Department.[1]

After Phillips refused to deliver the certificate of title to Latham Motors, Latham Motors filed a complaint against Phillips and Delgado seeking damages and request-

ing that Phillips be compelled to turn over the title. The complaint alleged that Phillips was tortiously interfering with Latham Motors' contract with Delgado, and that Delgado was in breach of that contract. Latham Motors later filed an amended complaint alleging fraud on the part of Delgado. Phillips answered Latham Motors' amended complaint and counterclaimed, requesting that Latham Motors either return the car or pay him for the car.[2]

The case was originally assigned to the magistrate division. The magistrate held a trial in June, 1989, and entered judgment in favor of Phillips requiring Latham Motors either to return the Tempo to Phillips or pay him $4,995. The magistrate also awarded costs and attorney fees to Phillips. Latham Motors appealed this judgment to the district court.

In regard to the appeal, the district court initially entered an order under I.R.C.P. 83(b) stating that the appeal would be heard as an appellate proceeding. After the parties filed appellate briefs, the district court heard oral argument in November, 1989. After oral argument, but before issuing a decision, the district court determined to order a trial de novo in the district court.

The district court held the trial de novo in May, 1990, after which the court entered a judgment in favor of Latham Motors. The district court concluded that on December 13, 1988, Delgado had apparent and actual authority to transfer ownership of the Tempo to Latham Motors because she was listed as an alternate owner on the Tempo's certificate of title. The court further concluded that the bill of sale between Delgado and Latham Motors was a valid and binding contract which did transfer ownership of the Tempo to Latham Motors. The district court also concluded that the

---

1. It is undisputed that on December 15, 1988, after Sherry informed Latham Motors that her father would not surrender the title, Latham Motors filled out the request for duplicate title and transfer of title forms which Sherry had previously signed. In filling out the request for duplicate title form, Latham Motors falsely represented that the original certificate of title was lost, when Latham Motors knew that the certifi-

cate of title was not lost, but in the possession of Gaylord Phillips. Latham Motors then had the request notarized under Sherry's previously obtained signature.

2. In September, 1989, Latham Motors obtained a default judgment against Delgado for $9,090.77.

Motor Vehicle Code does not require actual physical delivery of the certificate of title at the time of the sale of a motor vehicle in order to transfer ownership of the vehicle. Phillips appeals from this judgment and from the order granting a trial *de novo*.

## II. ISSUES ON APPEAL

The parties raise essentially two issues on appeal: (1) whether the district court erred in ordering a trial *de novo* of the matter; and (2) whether the district court committed reversible error in awarding title of the Tempo to Latham Motors. Both parties have also requested attorney fees on appeal. We will address these issues in turn.

## III. ANALYSIS

1. *The Order for a Trial de Novo.*

■ We turn first to the question whether the district court erred when it ordered a trial *de novo* after having heard appellate argument, but before issuing an appellate decision. Idaho Code § 1–2213 prescribes the powers of district judges when hearing appeals from lower courts:

**Appeals—Powers of district judge.**—(1) Appeals from final judgments of the magistrate's division shall be taken and heard in the manner prescribed by law or rule.

(2) Unless otherwise provided by law or rule, a district court judge shall review the case on the record on appeal and affirm, reverse, remand, or modify the judgment; provided, that the district judge in his discretion, may remand the case for a new trial with such instructions as he may deem necessary or he may direct that the case be tried *de novo* before him.

Pursuant to the above-quoted rule, a district court, on an appeal from the magistrate division, has basically two options: (1) conduct an appellate review of the magistrate's decision just as the appellate courts would review a district court's decision; or (2) order a trial *de novo* and begin the case anew in the district court. *Winn v. Winn,*

101 Idaho 270, 272, 611 P.2d 1055, 1057 (1980).

Phillips contends that the district court, having undertaken the task of hearing the case as an appellate proceeding, could not have subsequently ordered a trial *de novo*. Our Supreme Court considered this issue in *Winn, supra,* and held that "the district court, having undertaken the task of conducting an appellate review, is *not* as a result precluded from conducting a trial *de novo*." *Winn,* 101 Idaho at 273, 611 P.2d at 1058. The Court in *Winn* also held that because I.A.R. 11 contains no provision permitting an appeal from an order for a trial *de novo*, such an order is not appealable. *Winn,* 101 Idaho at 271, 611 P.2d at 1056. Because the district court's order for a trial *de novo* is not appealable, we will not review that order on appeal.

2. *Ownership of the Tempo.*

■ We note initially, that when a district court orders a trial *de novo* of a case that was already tried to a magistrate, the slate is wiped clean, and the case begins anew. *Winn,* 101 Idaho at 272, 611 P.2d at 1057. In *Winn,* the Court further stated that an order for a trial *de novo* legally removes the magistrate's decision from the judicial record. *Winn,* 101 Idaho at 275, 611 P.2d at 1060. Accordingly, with respect to the issue before us—ownership of the Tempo—we review only the district court's findings and conclusions. In reviewing the findings and conclusions of a district court, we will defer to those findings made by the trial court which are supported by substantial evidence, but we will freely review whether the trial court's interpretation of the law as well as its application of the law to the facts as found. *Roberts v. Swim,* 117 Idaho 9, 12, 784 P.2d 339, 342 (Ct.App.1989).

■ The resolution of this appeal turns on the interpretation of the Idaho Motor Vehicle Code, which is a question of law that we review freely. The Idaho statute which was in effect at the time this action arose defined an owner of a motor vehicle as "[a] person who holds the legal title of a vehicle...." Former I.C. § 49–401(e), *re-*

*pealed* by Act effective January 1, 1989, ch. 265, 1988 Idaho Sess. Laws 549.[3] Other pertinent sections of the Motor Vehicle Code provided that delivery of the certificate of title shall be made to the purchaser whenever a vehicle is sold or otherwise disposed of, and that issuance of a certificate of title from the Transportation Department is a prerequisite to acquiring title to the vehicle. Specifically, former I.C. § 49–403,[4] provided:

> No person shall hereafter sell or otherwise dispose of a motor vehicle without delivery to the purchaser or transferee thereof a certificate of title with such assignment thereon as may be necessary to show title in the purchaser....

The subsequent section, former I.C. § 49–404,[5] provided:

> [N]o person acquiring a motor vehicle from the owner thereof, whether such owner be a dealer or otherwise, shall hereafter acquire any right, title, claim or interest in or to said motor vehicle until he shall have issued to him a certificate of title....

Under the provisions of the Motor Vehicle Code in effect at the time this case arose, the process for assigning or transferring title to a vehicle required that the transferor deliver to the transferee the "certificate of title with such assignment thereon as may be necessary to show title in the purchaser." I.C. § 49–402. The transferee was then required to submit to the Transportation Department an application for issuance of a new certificate of title, with the assigned title or the bill of sale attached to the application. When the Department was satisfied that the applicant was the owner of the vehicle and that the application was in proper form, the Department would then issue a new certificate of title in the name of the new owner. Former I.C. § 49–405 (as enacted in 1988).[6]

Phillips, citing *Lux v. Lockridge*, 65 Idaho 639, 150 P.2d 127 (1944), has asserted that Latham Motors utterly failed to comply with these provisions of the Motor Vehicle Code, and therefore never acquired ownership, or any other right, title, claim or interest, in the Tempo. The district court, however, ruled in favor of Latham Motors, concluding that Delgado had authority to transfer title to the Tempo, and that, under *Dissault v. Evans*, 74 Idaho 295, 261 P.2d 822 (1953), the Motor Vehicle Code did not require actual physical delivery of the certificate of title at the time Delgado sold the Tempo in order to transfer ownership of the vehicle to Latham Motors. For the following reasons, we reverse the judgment of the district court.

The language of the Motor Vehicle Code quoted above is clear and unambiguous in providing that the owner of a vehicle is one who holds legal title to the vehicle, and "no person ... shall ... acquire any ... title ... in or to [a] motor vehicle until he shall have issued to him a certificate of title to said motor vehicle...." In the *Lux* case, our Supreme Court held that a purchaser not receiving the certificate of title is not a bona fide purchaser for value, and therefore the purchaser who failed to obtain a title certificate could not prevail against the party who had a certificate of title issued in his name. *Lux*, 65 Idaho at 643, 150 P.2d at 128. In reaching this decision, the Court noted that all of the parties were charged with notice of the code section which provided that no person could acquire any right, title, claim or interest in or to a motor vehicle until the purchaser had issued to him the certificate of title, and it was undisputed that the certificate of title remained at all times in the seller's possession and no certificate of title was ever issued to the purchaser.

The district court erroneously relied on the Supreme Court's decision in *Dissault* in concluding that title in this case belonged to Latham Motors. The *Dissault* case held that in certain circumstances one who purchases a vehicle without receiving the cer-

---

**3.** A revised form of this provision was reenacted as I.C. § 49–116(3).

**4.** This section is now codified as I.C. § 49–502.

**5.** Now codified as I.C. § 49–503.

**6.** This section is currently codified as I.C. § 49–504.

tificate of title may nevertheless be awarded title to the vehicle as against one possessing the certificate of title when the purchaser is a bona fide purchaser for value and the certificate of title is not issued in the name of the party holding the title. In this very limited circumstance, the certificate of title does not give any indication of the certificate holder's interest in the vehicle, and the party possessing the certificate has failed to comply with the Code by having title issued in its name.

In *Dissault*, the car in question was originally purchased by the Pocatello Automobile Dealers Association. However, title to the car was issued in the name of E.S. Barrett, an automobile dealer who was then president of the Association. Some time later, after Barrett and the attendant finance company "signed off" on the back of the certificate of title without designating any purchaser or assignee, Barrett sold the car to Evans. Evans paid the full purchase price of the car, but never received the certificate of title from Barrett. Evans was led to believe that one of Barrett's salesmen was taking care of the transfer of title. Barrett never paid the Association for the car. After Dissault succeeded Barrett as president of the Association, Dissault took the certificate of title and filled in his name as the assignee and secured from the Department of Law Enforcement issuance of a new title in his name. After Evans refused to surrender the car to the Association, the Association sued Evans, claiming that the Association had absolute title to the car under former I.C. § 49–404, because Evans never received any certificate of title.

Our Supreme Court held that title vested in Evans as against the Association, even though Evans never acquired the certificate of title and the Association had the title in its possession. Crucial to the Court's holding, however, was the fact that Evans was a bona fide purchaser for value who purchased the vehicle without any notice of the Association's interest in the car. At the time Evans purchased the car from Barrett, the certificate of title showed only the name of Barrett, and gave no indication that the Association had any interest in the

car. The Court also relied on the fact that the Association had never had title issued in its name either, only in the name of its presidents (Barrett and then Dissault); thus, the Association had also never properly acquired title under the provisions of the statute. Under *Dissault*, one who acquires a vehicle as a bona fide purchaser for value, but who fails to obtain the vehicle's certificate of title, may be awarded title as against a party holding the certificate of title where the party holding the title certificate had also failed to comply with the statute by not having title issued in its name, and thus the purchaser had no notice of the title holder's interest in the vehicle.

A review of the facts of this case reveals that the analysis employed in *Dissault* does not support the position of Latham Motors in this case. Latham Motors, unlike Evans in the *Dissault* case, was not a bona fide purchaser of the Tempo. The certificate of title in this case had the title holder's (Phillips') name on it, and Latham Motors was given actual notice of that fact by Delgado. Latham Motors was also informed that the certificate of title was in Phillips' possession. Thus, Latham Motors had actual notice of Phillips' ownership interest in the Tempo.

Latham Motors cannot disclaim the notice of Phillips' ownership interest by arguing that the title listed Phillips and Delgado as alternative owners, and thus Latham Motors reasonably believed that Delgado had authority to sell the car without Phillips' consent. While the record is clear that Latham Motors was told that both Delgado's and Phillips' names were on the title, there is no evidence to show that Latham Motors knew or believed that the title was issued to "Phillips, Gaylord *or* Sherry," as opposed to "Phillips, Gaylord *and* Sherry," when they acquired the car from Delgado. There is no evidence that Delgado told Latham Motors anything more than that both names were on the title, and the record is clear that Latham Motors did not call the Transportation Department to verify the exact wording of the title until two days after Latham Motors acquired the Tempo

from Delgado, and after they had already sold the car to someone else. Latham Motors cannot claim that it purchased the Tempo reasonably relying on the fact that the title listed Phillips and Delgado as alternate owners when Latham Motors had no reason to believe such was the case. Because Latham Motors purchased the Tempo with notice of Phillips's interest in the car, Latham Motors was not a bona fide purchaser.

Nor is Phillips's position in this case equivalent to the groundless position of the Association in *Dissault.* Unlike the Association in *Dissault*, Phillips complied with the provisions of the statute by having title to the Tempo issued in his name. Thus, Phillips held legal title to the car and met the statute's definition of an owner. The certificate of title in *Dissault* was not issued in the name of the Association, and therefore the Association, which was claiming title by virtue of Evans' failure to comply with the statute, had itself failed to comply with the statute and failed to give notice of its interest in the car.

Because Latham Motors never had title issued in its name, Latham Motors never acquired any right, title, claim or interest in the Tempo, and never became an "owner" of the vehicle as defined by the Code. On the other hand, Phillips, unlike the title certificate holder in *Dissault*, did have a certificate of title issued in his name, and he was an owner of the vehicle. Therefore, Phillips is entitled to the vehicle's title as against Latham Motors, and the judgment of the district court is reversed.

■ The district court is instructed on remand to enter judgment in favor of Phillips with respect to Latham Motors' claim and Phillips' counterclaim. Phillips' measure of damages for the total loss of the Tempo is the fair market value of the car at the time of the loss.[7] *Gibson v. Hardy,* 109 Idaho 247, 251, 706 P.2d 1358, 1362 (Ct.App.1985); *Gregory v. Padilla,* 379 P.2d 951, 956 (Alaska 1963) (in a claim and delivery action where the property is not returned the measure of damages is the fair market value of the property at the time it was taken); *La Vie v. Crosby,* 43 Or. 612, 74 P. 220, 222 (1903). Fair market value is defined generally as:

> [T]he price in cash, or its equivalent, that the property would have brought at the time of taking, considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar properties at or near the location of the property taken, with a reasonable time allowed to find a purchaser.

Black's Law Dictionary 597-98 (6th ed. 1990).

The district court found that on December 13, 1988, the Tempo had an actual cash value of $1,500. That finding is based on the testimony of Latham Motors' salesman who testified that when Delgado traded-in the Tempo the Tempo had an actual cash value of $1,500, even though Latham Motors credited Delgado with $2,250 for the trade-in toward the purchase of the Daytona. The trial court's finding is in error, however, because the fair market value in this case should be established by the price Latham obtained for the Tempo on resale. The undisputed evidence in the record shows that within two days of purchasing the Tempo from Delgado, Latham Motors sold the Tempo to a subsequent purchaser for a listed sales price of $4,995. Latham Motors asserts that the actual sales price of the Tempo to the subsequent purchaser was $3,345, inasmuch as Latham Motors credited the subsequent purchaser with $1,650 on his trade-in vehicle, a 1980 Volkswagen Bug. Latham further asserts that the trade-in vehicle was really worth only $100, the price for which it was subsequently sold.

The fair market value of the Tempo should be determined by what a willing buyer would have paid for the car on an open market near the time and place where

**7.** The record shows that in December 1990, the parties agreed to and the court ordered the sale of the Tempo, the proceeds of which were to be placed by the clerk of the court into an interest bearing account. The record does not indicate, but we will assume, that the agreement and order were carried out, and therefore the Tempo cannot be returned to Phillips.

the car was taken. This case presents the rare situation when the Court is not required to imply from circumstantial evidence what that amount would have been. Under the undisputed facts of this case, we reverse the finding of the trial court and hold that the fair market value of the Tempo is at least $3,345, plus the value of the Volkswagen Bug offered as a trade-in. On remand, the district judge should determine the Bug's value, taking into account the conflicting evidence on that issue. The district court is instructed to enter judgment in favor of Phillips of $3,345, plus the value of the Bug, which sum represents the fair market value of the Tempo at the time of the loss.

The district court is also instructed to award Phillips his costs and attorney fees incurred below, both in the magistrate division and in the district court, pursuant to I.C. § 12-120(1), which provides for an award of attorney fees to the prevailing party in any action where the amount pleaded is $25,000 or less. Phillips is also awarded his costs and attorney fees on appeal pursuant to I.A.R. 40 and 41.

### CONCLUSION

Because Phillips's appeal of the district court's order for a trial *de novo* is not an appealable order, that portion of his appeal is dismissed. Based on the reasoning set forth above, title to the Tempo is held to be in Gaylord Phillips as against Latham Motors, who purchased the Tempo with notice of Phillips' interest in the car, and who, contrary to the mandate of former I.C. § 49-404, failed to have title to the car issued in its name. Accordingly, the judgment of the district court is reversed, and the case is remanded to the district court for entry of judgment in favor of Phillips in accordance with the instructions set forth above.

SWANSTROM, J., and CAREY, J. Pro Tem., concur.